IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **Stacy Hyer,** | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 3:20-cv-00042-TPK |
| **Andrew Saul,** | : | Magistrate Judge Kemp |
| **Commissioner of** | | |
| **Social Security,** | : | |
| Defendant. | : | |

**OPINION AND ORDER**

    Plaintiff Stacy Hyer filed this action seeking review of a final decision of the Commissioner of Social Security. That decision, issued by the Appeals Council on December 17, 2019, partially denied her application for supplemental security income. Plaintiff filed a statement of errors on August 6, 2020 (Doc. 12) to which the Commissioner responded on October 19, 2020 (Doc. 15). The parties have consented to final disposition of this case by a United States Magistrate Judge. For the following reasons, the Court will **OVERRULE** the statement of errors (Doc. 12) and **DIRECT** the Clerk to enter judgment in favor of the Defendant Commissioner of Social Security.

**I. INTRODUCTION**

    Plaintiff filed her application on April 4, 2014, alleging that she became disabled on January 1, 2013. After initial administrative denials of her claims, two hearings before an administrative law judge, and the issuance of an unfavorable decision by that ALJ, the Appeals Council remanded the case for additional proceedings. Those proceedings included a video hearing held before a different ALJ on October 4, 2018, at which Plaintiff, a vocational expert, Brian Womer, and a medical expert, Dr. Steven Goldstein, all testified.

    The second ALJ issued a partially favorable decision on January 22, 2019. In that decision, she first found that Plaintiff had not engaged in substantial gainful activity since her application date. The ALJ next concluded that Plaintiff suffered from severe impairments including cervical degenerative disc disease, thoracic degenerative disc disease, obesity, poly-substance abuse disorder, deep vein thrombosis, polyneuropathy, and depression. However, the ALJ also found that none of these impairments, taken singly or in combination, met the criteria

for disability found in the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could, until July 30, 2018, perform a reduced range of sedentary work. She concluded that Plaintiff was capable of the exertional demands of sedentary work except that she could not lift overhead bilaterally. She could never climb ropes, ladders, stairs, and scaffolds, could not crouch, crawl, kneel, or balance on uneven, moving, or narrow surfaces, could occasionally stoop and climb ramps, and could not work at unprotected heights, around dangerous moving machinery, or in extremes of temperature. Lastly, she could understand, remember, and carry out simple tasks with simple instructions in a routine work setting without production rate work or strict production quotas and with only occasional changes in work processes. The ALJ next determined that, beginning on July 30, 2018, in addition to these restrictions, Plaintiff would also need to take one hour of additional breaks per workday.

The ALJ decided that with these limitations, Plaintiff (who had no past relevant work) could, in accordance with the testimony of the vocational expert, do certain sedentary jobs prior to July 30, 2018, including food order clerk, polishing machine operator, and sorting machine operator. The ALJ also found, in accordance with the expert's testimony, that these jobs exist in significant numbers in the national economy. As a result, she concluded that Plaintiff was not disabled within the meaning of the Social Security Act before July 30, 2018. However, the ALJ also concluded that once the Plaintiff's functional capacity was reduced due to needing to take an additional one hour of breaks during the day, she could not work, and she therefore awarded benefits beginning on that date.

In her statement of errors, Plaintiff raises three issues. She disputes the ALJ's "conclusory" determination that she did not qualify for benefits under sections 11.09 and 11.14 of the Listing of Impairments; argues that the ALJ misinterpreted Dr. Goldstein's testimony; and asserts that the ALJ erred by not finding that Plaintiff was functionally limited in the use of her hands and needed to elevate her legs while seated.

## II. STANDARD OF REVIEW

As this Court said in *Jeter v. Comm'r of Soc. Sec. Admin.*, 2020 WL 5587115, at *1–2 (S.D. Ohio Sept. 18, 2020)**,**

> Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014);

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.' " *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.' " *Rabbers,* 582 F.3d at 651 [quotations and citations omitted].

### III. FACTUAL BACKGROUND

The Court will begin its review of the factual background of this case by summarizing the testimony given at the administrative hearings. It will then recite the pertinent information found in the medical records.

Plaintiff, who was 40 years old when she filed her application, testified that she lived with several of her children and had completed some college work. She was a hairdresser in the 1990s but had not worked for many years prior to submitting her application for benefits. At first, she did not work because she chose to be home to raise her children, but then she developed symptoms of a demyelinating disease which could be multiple sclerosis, although tests for that disease were inconclusive. Her initial symptoms included difficulty with bowel and bladder control as well as problems such as foot drop and being unable to turn her head. Later, she developed whole body pain.

Plaintiff also testified that she was taking medication for various conditions including seizures, blood clots, nerve pain, fatigue, and depression. As of 2017 she had not received any mental health counseling. She walked with the assistance of a cane or a walker and seldom drove. Her activities at that time included reading or using the computer, but not household chores. Later, she said she did not read, but did listen to music and occasionally socialized with friends. When asked about her physical abilities, Plaintiff said that she could sit but had problems if her legs were not elevated, and that she could stand, walk, and lift very little.

At the final administrative hearing, the ALJ took testimony from Dr. Goldstein as a

medical advisor. He said that Plaintiff's diagnoses included degenerative disc disease of the cervical spine, obesity, polyneuropathy, and drug and alcohol abuse. He saw mention of MS in the records but no definitive diagnosis. Dr. Goldstein said that in his opinion Plaintiff could do light work, but he also testified that based on the results of a consultative neurological examination, her functional capacity was less than sedentary. He noted that the symptoms described during that examination did not appear to meet the twelve-month durational requirement, however. When asked about various examinations which showed severe impairments, he pointed out that other examinations were essentially normal, and questioned whether this pattern was due to MS, small strokes, or drug abuse.

The vocational expert, Mr. Womer, testified as summarized above, identifying sedentary jobs that could be done by someone with the residual functional capacity determined by the ALJ. He also said that those jobs would be unaffected by the use of a cane or walker, but would be ruled out if the person also had to take an additional hour of breaks during the workday or could not sit, stand, and walk for a total of eight hours in a workday.

The medical record is extensive. It does not, however, contain a definitive diagnosis of multiple sclerosis, and it is fair to say the objective examination findings vary widely over time. Both parties have largely confined their detailed discussion of the record to the argument section of their memoranda, and the Court elects to do the same. It now turns to Plaintiff's three assignments of error.

## IV. DISCUSSION

### A. The Listing of Impairments

Plaintiff's argument about the Listing of Impairments focuses on Sections 11.09 and 11.14, which deal with neuropathy and multiple sclerosis. These Sections read in relevant part as follows:

> 11.09 **Multiple sclerosis, characterized by A or B**:
>
> > A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; ....
>
> 11.14 **Peripheral neuropathy, characterized by A or B**:
>
> > A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; ....

Both Sections incorporate Sections 11.00D1 and 11.00D2, which address disorganization of motor function.  They provide:

> 1. Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity. All listings in this body system [with exceptions not pertinent here] include criteria for disorganization of motor function that results in an extreme limitation in your ability to:
>
> a. Stand up from a seated position; or
> b. Balance while standing or walking; or
> c. Use the upper extremities (including fingers, wrists, hands, arms, and shoulders).
>
> 2. Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).
>
> a. Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes.
> b. Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes.
> c. Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

Plaintiff argues that neither the ALJ nor Dr. Goldstein provided a specific or detailed evaluation of these Sections and that the medical records are replete with the recitation of symptoms and

diagnoses that show she did not have the ability to ambulate effectively. The Commissioner responds that there was ample evidence in the record that, at times, Plaintiff was able to walk independently or with only the assistance of a single-pronged cane, and points out that none of the three non-examining physicians - state agency reviewers Drs. Bolz and Manos and testifying expert Dr. Goldstein - concluded that Plaintiff's symptoms satisfied any section of the Listing of Impairments.

The record supports this latter argument. Dr. Goldstein was specifically asked if any of Plaintiff's conditions, taken separately or in combination, met or equaled any section of the Listing, and he replied "Not in my opinion, Your Honor." (Tr. 2651). Dr. Bolz concluded that Plaintiff could perform light work activity, including standing and walking for four hours in a workday. (Tr. 88-90). Dr. Manos reached the same conclusion. (Tr. 104-07). Although the two state agency reviewing physicians did not have the benefit of the entire record, Dr. Goldstein did. No other physician expressed the view that Plaintiff met the Listing. Consequently, the question becomes whether the ALJ devoted sufficient discussion to this issue and whether her conclusion is supported by substantial evidence.

The ALJ made a general determination that "the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (Tr. 21). She then discussed a number of sections separately, including Listing 11.14. The ALJ noted that this Listing requires, among other things, disorganization of motor function in two extremities causing extreme limitations in various activities like standing or balancing, and said that the evidence of record did not demonstrate the presence of such disorganization. (Tr. 22). Although the section of the administrative decision dealing specifically with the Listing does not contain a detailed recitation of the evidence, other portions of the decision do so. *See* Tr. 24-34. That evidence includes, at various times, both notations of abnormal gait and descriptions of a normal gait with the ability to toe walk, tandem walk, and hop on both feet and the ability to engage in effortful tandem gait and to rise on heels and toes. The ALJ expressed her awareness of this conflict in the evidence when she made her residual functional capacity finding and resolved it in favor of a finding that Plaintiff retained some ability to stand and walk during a normal workday. (Tr. 34-35).

This Court has acknowledged that the Court of Appeals, in *Reynolds v. Comm'r of Soc. Security,* 424 Fed.Appx. 411, 416 (6th Cir. Apr. 1, 2011), concluded that an ALJ "must 'actually evaluate the evidence' and 'give an explained conclusion' for why a plaintiff did not meet a listing." *See Stewart v. Comm'r of Soc. Security*, 2018 WL 1443686, at *9 (S.D. Ohio Mar. 23, 2018), *report and recommendation adopted,* 2018 WL 1980254 (S.D. Ohio Apr. 27, 2018). And in *Sharp v. Colvin*, 2015 WL 630641, at *10 (N.D. Ohio Feb. 13, 2015), the Court said that "[w]hile no heightened articulation at step three is required, an ALJ must nevertheless articulate findings that will permit meaningful judicial review of his findings." At least some courts have held, as the Commissioner's memorandum notes, that this articulation need not necessarily be a part of the ALJ's Step Three analysis so long as it can be found elsewhere in the administrative

decision and so long as the decision, in its entirety, permits the Court to review the ALJ's reasoning process concerning the Listing of Impairments. *See, e.g., Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005). And Courts within this Circuit have applied a harmless error analysis to any failure of the ALJ to provide an adequate explanation of her reasoning at Step Three. *See, e.g., Roby v. Colvin*, 2016 WL 164325 (Jan. 13, 2016).

Here, the ALJ did consider Section 11.14 and, by extension, Section 11.09, since both incorporate the limitations described in Section 11.00D. She explained what she believed to be the key requirement of the Listing and said that the evidence did not show that it had been met. Although she did not immediately thereafter discuss why she reached that conclusion, her later extensive summary of the evidence and her decision to resolve conflicts in that evidence in favor of a finding that Plaintiff could ambulate sufficiently to stand and walk for two hours in a workday provide a sufficient basis for the Court to review that decision. Consequently, the issue can be narrowed to whether there is substantial support in the record for the proposition that Plaintiff's impairment did not satisfy Sections 11.09 and 11.14 of the Listing.

Part of Plaintiff's argument is based on the wording of the order of remand from the Appeals Council which directed the ALJ to engage in further analysis of the evidence concerning Plaintiff's ability effectively to ambulate and use her hands and arms. The Appeals Council noted that the prior administrative decision did not discuss evidence from Dr. Imitola and others showing that Plaintiff "obtained several scores on the timed 25-foot walk test above 8 seconds" and "scores on the 9-hole peg test above 30 seconds (indicating bilateral hand weakness and upper extremity dysfunction." There was also evidence noted by the Appeals Council that Plaintiff did poorly on a walking speed test and was at high risk for falls, having been treated for falls on four occasions in 2016. Additionally, the remand order highlighted the fact that Plaintiff used a cane and that Dr. Kim, a physiatrist, had recommended use of a power scooter. All of these things suggested that Plaintiff might not be able to work at the light exertional level (which is what the prior administrative decision concluded). The Appeals Council was also concerned about the way in which the prior ALJ had evaluated the opinion evidence, particularly the evidence from Dr. Kim stemming from his 2017 examination, which was described as consistent with results of prior testing even though the ALJ concluded otherwise. Part of the instructions on remand were for the ALJ to "obtain evidence from a medical expert related to the nature and severity of functional limitations resulting from the claimant's neurological impairments...." *See* Tr. 142-48. That is why the ALJ sought and obtained expert testimony from Dr. Goldstein. Plaintiff does not argue that the ALJ failed to heed this instruction, but argues that both the evidence cited in the remand order and other evidence undercuts the ALJ's decision to the extent that it is not supported by substantial evidence.

There is certainly a great amount of evidence demonstrating that Plaintiff had some significant functional limitations. As Plaintiff's review of that evidence show, she often had trouble walking during her physical examinations, had swelling in her lower legs and a tendency to develop blood clots, walked with an antalgic gait, had diagnoses of muscle weakness, abnormality of gait, imbalance, and lack of coordination, and had been prescribed a motorized

scooter because she was "not a functional ambulator." *See Plaintiff's Statement of Errors,* Doc. 12, at 7-9.

On the other hand, as the Commissioner's review of the record reveals, and as the ALJ found, there is evidence that, at various examinations, Plaintiff's range of motion and strength were within normal limits, that her sensation was grossly intact, that although she suffered from foot drop, it was mild and addressed by a brace, that clinical findings concerning her degenerative disc disease were mild, that her deep vein thrombosis was being treated by medication, that she could sit comfortably, that she could rise from a chair without effort, that her gait was normal, that she was stable during a balancing test, and that she walked at times without a cane. It was this evidence as well as other evidence, such as the fact that Plaintiff was described as full weight-bearing on both legs and that her walking and balance had improved in 2017, which the ALJ relied on in finding that Plaintiff could do a reduced range of sedentary work. As the ALJ explained,

> Greater standing and/or walking, sitting, and lifting/carrying/pushing limitations are not supported due to the conflicting physical examinations in the file noting a normal gait/abnormal gait, use of an assistive device/lack of an assistive device.... Some examinations found her upper extremities with normal range of motion.... Some examinations noted intact sensation.... Some DVT tests were negative.... In addition, her cervical degenerative disc disease did not cause any neck functional limitations based on the physical examinations and lack of treatment for her neck.... Finally, the claimant's impairments were treated with physical therapy and medication.

Tr. 34-35. The ALJ said that she had taken into account Plaintiff's polyneuropathy and the existence of "some abnormal physical examination findings in strength and sensation" but did not impose greater limitations because "some physical examinations of her lower extremities were normal" and because "examination found her hip strength fair to good and bilateral knee strength normal to fair plus." Tr. 35. Plaintiff does not argue that the ALJ mischaracterized the record in any way, but asserts rather that the overwhelming weight of the evidence renders the ALJ's interpretation of the record unreasonable.

As the Court of Appeals has long recognized, "[i]t is the Commissioner's function to resolve conflicts in the medical evidence...." *Craft v. Comm'r of Soc. Sec.*, 39 Fed. App'x 274, 276 (6th Cir. June 25, 2002). There are many such conflicts evident in this record. Certainly, there is evidence from which one might conclude that Plaintiff had great difficulty walking and balancing while standing and walking. But the existence of substantial evidence to support such a conclusion is not really the issue. If "substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009), *quoting Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997). That is the situation presented here. A reasonable person could have concluded, as did the ALJ, that Plaintiff retained

the ability to stand, walk, and balance with minimal risk of falling and without the need for a walker or two canes to do so, therefore rendering Section 11.00D inapplicable. That being so, there was no error committed by the ALJ in her analysis of the Listing of Impairments, and no basis for reversing her decision on that issue.

### B. Dr. Goldstein's Opinion

Plaintiff's second argument is that the ALJ erred by giving great weight to the opinions expressed by Dr. Goldstein at the administrative hearing. She notes that the ALJ cited, as one reason for doing so, the fact that Dr. Goldstein had reviewed the entire medical record. However, she asserts that Dr. Goldstein seemed not to have familiarity with much of the record and she claims that his testimony contained "substantial speculation and hedging." *See* Plaintiff's Statement of Errors, Doc. 12, at 10. Lastly, she contends that the medical evidence conflicted with his conclusions. The Commissioner responds that there is nothing in the record to suggest that Dr. Goldstein failed to consider any relevant portion of the medical records and that he demonstrated familiarity with that evidence throughout his testimony.

Determining the credibility of witnesses who testify at an administrative hearing is generally the province of the ALJ. *See, e.g., Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). It is also up to the ALJ to decide how much weight to give to the opinions of the various medical experts whose conclusions appear in the record, and the Court must accord significant deference to those decisions so long as there is substantial evidence to support the ALJ's evaluations. *See Lewis v. Saul*, 2021 WL 115652 (E.D. Ky. Jan. 12, 2021). The real question raised by Plaintiff's second argument is whether, given the testimony of Dr. Goldstein and the balance of the medical record, it was unreasonable for the ALJ to give great weight to his opinions. The Court cannot reach that conclusion.

The purported deficiencies in Dr. Goldstein's knowledge of the record are, in the Court's view, nothing more than areas of normal cross-examination of a medical expert who was tasked with reviewing a very extensive medical record. There is no suggestion that Dr. Goldstein did not actually review the record, and his testimony shows that he engaged in a fairly thorough analysis of that evidence. When certain items were specifically brought to his attention, he responded with testimony that explained those items and why (if that was the case) he differed with the conclusions of certain examiners. In short, it was reasonable for the ALJ to conclude that Dr. Goldstein had considered the record in an adequate enough fashion for his testimony to be generally reliable.

Plaintiff's other contention under this claim of error is that the ALJ should not have given great weight to Dr. Goldstein's testimony because it was not consistent with the weight of the medical evidence. The ALJ reasoned that Dr. Goldstein's opinions were deserving of great weight because he did (unlike the two state agency reviewers) have the opportunity to, and did, review the entire record, he was experienced in the field of neurology, and his opinions were "consistent with the objective and diagnostic evidence in the file." (Tr. 36). The question posed

here is essentially the same as the issue raised in the previous statement of error, and Plaintiff argues it in that fashion. Having found no error in the way in which the ALJ evaluated the record in connection with the Listing of Impairments, and in the absence of any more specific argument concerning the reliability of Dr. Goldstein's opinions, the Court finds no merit in the second claim of error.

### C. Functional Limitations on Hands and Legs

The final issue raised in Plaintiff's statement of errors relates to her ability to use her hands and her need to elevate her legs while seated. Plaintiff notes that the prior administrative decision found that she had some limitations concerning the use of her hands to handle and finger, and she also points out that tests from 2016 demonstrated some abnormalities in her right arm. She further relies on the fact that the order of remand from the Appeals Council highlighted her slow performance on the 9-hole peg test suggesting both hand weakness and upper extremity dysfunction. With respect to leg elevation, Plaintiff argues that her various impairments including polyneuropathy and Raynaud's disease and her propensity to develop blood clots in her legs made it mandatory that the ALJ find she had the need to keep her legs elevated.

In response, the Commissioner characterizes Plaintiff's argument as asking the Court to reweigh the evidence and argues that the limitations imposed by the ALJ, including restricting Plaintiff to lifting only ten pounds occasionally and prohibiting her from reaching overhead, were sufficient to account for any upper extremity issues. The Commissioner also points out that other than Plaintiff's own testimony and an isolated medical record from 2013, there is no support for the proposition that Plaintiff must keep her legs elevated.

The Commissioner has the better of this argument as well. Again, the evidence on how limited Plaintiff was in the use of her arms and legs is in conflict, and there is expert evaluation that supports the ALJ's findings. Dr. Goldstein did not impose the limitations for which Plaintiff argues, neither state agency reviewer found any need for her to elevate her legs while sitting, and Dr. Bolz found no manipulative limitations. The Court agrees that Plaintiff is simply asking this Court to reach a different conclusion than the ALJ - something it is not permitted to do so long as the record supports the ALJ's decision. That is the case here, and the Court therefore concludes that the ALJ's decision must be affirmed.

### V. CONCLUSION AND ORDER

For the reasons stated above, the Court **OVERRULES** the statement of errors (Doc. 12) and **DIRECTS** the Clerk to enter judgment in favor of the Defendant Commissioner of Social Security.

    **/s/ Terence P. Kemp**
    **Terence P. Kemp**
    **United States Magistrate Judge**